"The rule, therefore, that he who accepts a negotiable instrument to which the drawer's name is forged is bound by the act, and can neither repudiate the acceptance nor recover the money paid, has no application in behalf of one who has acquired the paper, in the absence of any consideration whatever therefor either present or past."

In the case at bar defendant paid full consideration for the check. [1] In any event the defendant was a holder of this check in due course under the Negotiable Instruments Law (chapter 43, Laws of 1909). Section 91 thereof provides:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That it is complete and regular upon its face;

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Defendant's course answers each of these requirements, and it is therefore a holder in due course, and comes within the general rule followed with practical unanimity ever since Price v. Neal, supra. That the payee of a check may be a holder in due course if he complies with the requirements of the Negotiable Instruments Law has been held, among other cases, in Boston Steel & Iron Co. v. Steuer, 183 Mass. 140, 66 N. E. 646, 97 Am. St. Rep. 426, Thorpe v. White, 188 Mass. 333, 74 N. E. 592, and Brown v. Brown, 91 Misc. Rep. 220, 154 N. Y. Supp. 1098.

[2, 3] It follows that plaintiff has no cause of action as assignee of the claim of Bergstrom & Co., the drawees of the check, nor has he any better standing as assignee of the claim of Mrs. Bergstrom, for she has sustained no loss, having her right of recovery of the $300 in question against Bergstrom & Co.; and neither Freund, who presumably profited by the forgery, nor any other person concerned in the transaction by which the money was obtained from the defendant, or from the drawees, was her agent, nor has she ever ratified their acts.

Judgment is therefore directed in favor of the defendant, with costs. All concur.

---

### MURPHY v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, Second Department. March 10, 1916.)

1. APPEAL AND ERROR ⬤⟹882(11)—REVIEW—FINDING—LACK OF EVIDENCE.

In a railroad employé's action for injuries, where plaintiff's evidence, that the electric shock he received would have caused a weakness of the abdominal wall, resulting in hernia, even if there was no inherent defect in the wall, was excluded on defendant's objection, defendant could not urge on appeal that there was no evidence that the contraction of the abdominal wall, caused by the electric current, would directly cause weakness.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3601; Dec. Dig. ⬤⟹882(11).]

---

2. EVIDENCE ⬡528(1)—EXPERT TESTIMONY—CAUSE OF HERNIA.

In a railroad employé's action for hernia, alleged to have resulted from an electric shock, expert testimony that it probably resulted from a shock operating upon some weakness in the abdominal wall was admissible, without preliminary showing of such weakness; it being known and testified that such weakness necessarily predisposes to all ruptures.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2335, 2336; Dec. Dig. ⬡528(1).]

3. MASTER AND SERVANT ⬡276(3)—INJURIES TO SERVANT—RESULT OF ACCIDENT—SUFFICIENCY OF EVIDENCE.

In a railroad employé's action for injuries, evidence *held* sufficient to justify the jury in finding that plaintiff's hernias resulted from the electric shock he received.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 951, 959; Dec. Dig. ⬡276(3).]

4. WITNESSES ⬡219(5)—PRIVILEGED COMMUNICATIONS—PHYSICIAN AND PATIENT—WAIVER.

In a servant's action for injuries, where defendant compelled plaintiff to give testimony as to his statement to a hospital physician regarding his injury, by recalling him to the stand and exacting a statement that he had told the doctor at the hospital how long he had had pain and when it first started, plaintiff did not waive his privilege covering his statement to the hospital physician.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 781, 782; Dec. Dig. ⬡219(5).]

Appeal from Trial Term, Westchester County.

Action by Jeremiah Murphy against the New York, New Haven & Hartford Railroad Company. From a judgment for plaintiff, an order denying its motion for new trial, and an order denying its motion to set aside the verdict for excessiveness, defendant appeals. Judgment and orders affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and PUTNAM, JJ.

James W. Carpenter, of Brooklyn, for appellant.

Thomas J. O'Neill, of New York City (Leonard F. Fish, of New York City, on the brief), for respondent.

THOMAS, J. The plaintiff, defendant's servant, was injured while working on a dead wire which, by negligence imputable to the defendant, became charged with an electric current. The plaintiff received several burns, quite inconsiderable in severity. At a later period a hernia appeared on the right side, for which he submitted to a successful operation, but thereupon a hernia appeared on the left side. The verdict for $7,500 is excessive, unless the plaintiff is entitled to recovery for the hernia on one or both sides. There is conflict of opinions between the plaintiff's expert and the defendant's two experts as to the probability of the accident causing the hernia.

The plaintiff relied for medical opinion entirely upon Dr. Churchill, who, shortly before the trial, made an examination for the purpose of testifying. He was asked an hypothetical question, which contains the assumption that the plaintiff before the accident was in good health and "never experienced any stomach trouble, or pain in the stomach,

*or in the region of the abdomen."* Dr. Churchill answered, upon the facts assumed, that the injury received on the day in question was an efficient and producting cause of both ruptures. He later said:

"Q. That is, the burns—the burns and shock of the electrical current was sufficient, you say, to cause the rupture? A. No; not the burns or the shock, but the sudden contraction of the muscles that takes place as the result of the electric current, the sudden contraction of all the abdominal muscles, causing an extra pressure upon the abdominal contents, and causing this bulging out of this weakened point. Q. That alone would be sufficient to produce rupture? A. There is another element that comes into that. It is probable in every case of rupture there is a weakness in the abdominal wall, that accounts for why some people have ruptures and others do not through the same violent strain. * * * Q. What do you assume here—that he had weakness in the walls? A. He probably had weak spots, spots where there was inherent weakness in the abdominal wall. Q. Inherent weakness as the result of this electrical current? A. No; it may have been congenital."

The defendant's motion to strike out the doctor's answer was denied. The appellant's point is that the question assumes that the man had been in good health, and that the doctor answered it upon an assumption, resting on no proven facts, that he probably had "weak spots, spots where there was inherent weakness in the abdominal wall."

[1] It is noticeable that the plaintiff's counsel, following the doctor's answer, desired to show that the injurious agent would cause this weakness of the abdominal wall, even if there was no inherent defect in it, but that the evidence was excluded upon the defendant's objection. Therefore the defendant may not urge that the case is destitute of evidence that the contraction caused by the electric current would directly cause such weakness.

[2] However, the defendant's position is untenable. So far as the man knew, he was in good health. He did not know, he had never experienced, that must mean consciously known, stomach trouble, pain in his stomach, or in the region of the abdomen. The doctor ascribes to the plaintiff a weakness in the abdominal walls which made the injury an effective cause of the hernia in this instance, because, as he says:

"Only the best authorities explain ruptures on that ground. In all cases of rupture there is some weakness in the abdominal wall. Where one man would get ruptured on certain muscular efforts, another man won't."

Hence, when he answered that the accident was a competent cause for hernia, he did so because experience had shown that probably in every case of rupture there is a weakness of the abdominal wall. In other words, the weakness is a characteristic antecedent condition where hernia appears. Therefore it was not necessary to show preliminarily that there was such weakness. Indeed, that might be beyond proof in a given instance. But as it is known that such weakness necessarily predisposes to all ruptures, and as it was so testified, the witness was not only justified in taking that into consideration, but he could not disregard it.

But, even so, there is a very sharp attack upon Churchill's main conclusion, by the defendant's experts Dr. Berges and Dr. Coley. Dr. Berges, upon the assumed state of facts, was asked whether he could

say with reasonable certainty whether such an injury as the plaintiff received, or such a shock as he received from the electric current, could be the competent producing cause of hernia. He answered, "I could not." His next answer is, "I say I cannot say that that would be the cause." When further asked whether the burn and shock would be a sufficient cause, he answered, "I don't think so." Then follows the answer:

"To the best of my belief, I do not. Q. That is your opinion, is it? A. That is my opinion; yes."

And he finally gives the opinion that the shock was not the cause of the hernia. But he testified that the usual cause for hernia developing is "congenital weakness generally." Upon cross-examination he finally stated:

"Q. You admit, then, that either a large amount of electrical current that violently contracts the muscles and the tissues of the abdominal wall, and a great relaxation, might produce hernia? * * * A. I admit that it might."

But his testimony also is that contraction could not cause it, as that would thicken the abdominal walls, and tend to give them strength, rather than to lend them weakness. But he was led to the last answer quoted by the fact that after contraction there is a relaxation, which might produce a hernia. It must be considered that Dr. Berges gives the opinion that the hernia could not result from the cause asserted, and we must rely upon probabilities and not possibilities. And yet his statement of the possibility indicates that Dr. Churchill in his answer was not without the realms of experience, although he may have exceeded probability in his conclusion.

Dr. Coley answered the defendant's hypothetical question shortly and decisively to the effect that the accident could not be a competent cause for the hernia. The vital element of Dr. Coley's thought is that hernia depends on congenital weakness. That confirms Dr. Churchill that there is an antecedent congenital weakness. Dr. Coley's statement is so relevant to the question under discussion that I quote from his testimony:

"Q. What is the cause of hernia, doctor? A. Hernia is a disease rather than an accident, due to congenital imperfections in the abdominal wall; the most important one being a preformed sac or arch in the peritoneum which exists at birth, and at some later time in life received the contents of the bowel, which is forced into this arch, but never by a single strain, but by a continuation, mutiple strains, due to lifting, or any ordinary increase of intra-abdominal strain of daily life, such as straining at the stool, coughing, or a hundred other things; the main point being that it is gradual in its onset, and practically never occurs as the result of a single strain or increased intra-abdominal force."

From this it appears that Dr. Churchill was correct in his answer to the hypothetical question, as the congenital weakness is always present in case of hernia. Therefore such fact must be taken into account in answering the hypothetical question. In this connection the evidence of what happened to the plaintiff may be noted. Plaintiff's

own statement is that he became unconscious. But Phelan, another workman, heard the call and testified:

"I saw him hanging there, I couldn't do anything for him."

He says:

"He was shaking, like this (indicating), and I heard the crackling noise in the wire of the juice going in."

[3] He estimates that such condition continued also two or three minutes. Then, as he said, when the current was turned off, "the static stopped, and Murphy fell off into a safety." The plaintiff stated that shortly after the accident he felt severe pains in the lower part of his stomach, that grew worse, and that finally he noticed a swelling below, which increased until he went to the hospital for operation on June 9th. He was injured on January 25, 1913, and worked for the defendant full time, with the exception of two days, until March 17th, stopping just before the strike on March 21st. He says that he felt the pains in the abdomen about three weeks after the accident, and that the pain was increasing until the time of the operation. I conclude that the jury was justified in finding that the plaintiff's hernias came from the accident, and that the finding is not against the weight of the evidence.

[4] There is another question. The defendant sought, but was not permitted, to examine the doctor from the hospital as to plaintiff's statement relative to the development of the pain in the abdomen. The defendant urges that the privilege had been waived, because the plaintiff gave testimony on that subject. But the defendant compelled him to do it, by recalling him to the witness stand, and, over the objection of plaintiff's attorney, exacted the statement that he had told the doctor at the hospital how long he had had the pain and when it first started. Having thus forcibly opened the plaintiff's mouth, he asserted a waiver of the privilege, and tried to examine the doctor. By such rule the privilege could never remain inviolate.

The judgment and orders should be affirmed, with costs. All concur.